IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| | ) | CR. NO. 05-00486 HG-KSC |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NOSHIR S. GOWADIA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANT NOSHIR S. GOWADIA'S MOTION TO SUPPRESS STATEMENTS MADE AT HONOLULU AIRPORT**

**AND**

**ORDER DENYING DEFENDANT NOSHIR S. GOWADIA'S MOTION TO SUPPRESS EVIDENCE SEIZED AS A RESULT OF A WARRANTLESS SEARCH**

Defendant Noshir S. Gowadia moves to suppress various statements, along with all evidence derived from those statements, that were made by Defendant to United States Government agents at the Honolulu International Airport. In addition, Defendant Gowadia moves to suppress evidence that was seized by Government agents at the Honolulu International Airport and from a container that was shipped by Defendant from Singapore to his home in Maui, Hawaii.

Defendant's Motions to Suppress concern four principal events: (1) Defendant's statements to Government agents on August 12, 2003, as Defendant was entering the United States via

1

Honolulu International Airport; (2) the evidence seized by Government agents on March 29, 2004, from a container entering Honolulu, Hawaii; (3) Defendant's statements to, and the evidence seized by, Government agents on April 19, 2004, as Defendant was exiting the United States via Honolulu International Airport; and (4) Defendant's statements to, and the evidence seized by, Government agents on June 7, 2004, as Defendant was exiting the United States via Honolulu International Airport. Defendant argues that the three sets of statements should be suppressed because Defendant was in custody during questioning and he was never read his <u>Miranda</u> rights. Defendant also argues that the seizure of his property was a violation of his rights under the Fourth Amendment of the United States Constitution.

Defendant Noshir S. Gowadia's Motion to Suppress Statements Made at Honolulu Airport (Doc. 214) is **DENIED**. Defendant Noshir S. Gowadia's Motion to Suppress Evidence Seized as a Result of a Warrantless Search (Doc. 215) is **DENIED**.

<u>**PROCEDURAL HISTORY**</u>

On November 8, 2005, an Indictment was filed against Defendant Noshir S. Gowadia ("Defendant" or "Gowadia"). (Doc. 11, "Indictment".)

On November 8, 2006, a Superceding Indictment was filed against Defendant. (Doc. 92, "Superceding Indictment".)

2

On October 25, 2007, a Second Superceding Indictment was filed against Defendant. (Doc. 133, "Second Superceding Indictment".)

On November 13, 2008, Defendant filed a Motion to Suppress Statements Made at Honolulu Airport. (Doc. 214, "Motion".) On the same day, Defendant filed a Motion to Suppress Evidence Seized as a Result of a Warrantless Search. (Doc. 215, "Motion".)

On December 5, 2008, the Government filed an Opposition to Defendant's Motion to Suppress Statements Made at Honolulu Airport and Defendant's Motion to Suppress Evidence Seized as a Result of a Warrantless Search. (Doc. 234, "Opposition".)

The hearings for the Motions were held on January 6-9, 2009, and January 12, 2009.

## BACKGROUND

### August 12, 2003

On August 12, 2003, Defendant Noshir S. Gowadia ("Defendant" or "Gowadia") arrived at Honolulu International Airport on China Airlines flight #18, from Singapore to Honolulu, Hawaii, via Taipei, Taiwan. Defendant declared $15,000 in U.S. currency and executed a Currency and Monetary Instruments Reporting Form. On that basis, Defendant was referred for a secondary inspection.

During the secondary inspection, Defendant told customs inspectors that he was an engineering consultant from Maui and that he had spent five days in Singapore and seven days in China to buy an antique desk. Defendant said that he did not purchase the desk, so he returned with the $15,000. Defendant's hand-carried baggage was searched, although nothing of interest was found.

March 29, 2004

In mid-March 2004, United States Customs and Border Patrol ("CBP") Officers Robert Tapia ("Officer Tapia") and Wilfred Pang ("Officer Pang") identified a container of furniture from Singapore consigned to Defendant which was due to arrive on April 2, 2004. Information available to the CBP officers indicated that Defendant was of interest to the Federal Bureau of Investigation ("FBI"). On March 24, 2004, Chief Customs Inspector Creighton Goldsmith ("Inspector Goldsmith") contacted FBI Special Agent Thatcher Mohajerin ("Agent Mohajerin"). Agent Mohajerin informed Inspector Goldsmith that Gowadia was the target of an investigation regarding the sale of stealth aircraft technology overseas.

The container arrived on April 3, 2004. On April 8, 2004, customs inspectors examined the container with x-ray equipment and identified an anomaly embedded among the several

4

pieces of furniture. The container was then opened, and a physical search of the contents was conducted. The search revealed that the anomaly was a box that contained documents. The CBP officers inspected the documents, and determined that they contained, among other things, sales contracts and information concerning aircraft infrared suppression technology. The CBP officers concluded that the documents concerned national security and/or military defense. The CBP detained the documents for further review.

On the same day, April 8, 2004, Inspector Goldsmith and Officer Tapia informed Department of Homeland Security Immigration and Customs Enforcement ("ICE") Special Agent Steven Marceleno ("Agent Marceleno") and Agent Mohajerin that the documents in the container described business transactions and technology related to aircraft and missile design. FBI Special Agent Charles Beckwith ("Agent Beckwith"), a pilot and former Air Force officer, reviewed the documents along with Agents Marceleno and Mohajerin. Their review determined that the documents could indicate that Defendant provided assistance to the Australian Government for the purpose of developing anti-missile infrared technology for C-130 military aircraft. Other documents contained proposals for developing infrared and heat signature reduction technology  for military aircraft, such as the C-130 and F-16, for Israel, Singapore, and Indonesia. A copy of Gowadia's resume

was also included in the documents that were reviewed. The resume indicated that Defendant previously worked on the development of the engine for the B-2 bomber while employed at Northrop.

Agent Beckwith's preliminary assessment, based on his past experience and training, was that some of the technology described in the documents was still classified. Agents Marceleno and Mohajerin concluded that the documents merited further review by experts in aircraft technology. They requested additional copies, which were made by the CBP and provided to Agent Marceleno on April 13, 2004. The container was then released for shipment to its final destination.

<u>April 19, 2004</u>

On April 19, 2004, United States Customs and Border Patrol ("CBP") Officer Keith Ikeda ("Officer Ikeda") informed Agent Marceleno that Gowadia was scheduled to depart Honolulu International Airport that morning on China Airlines fight #17 to Singapore. Agent Marceleno requested that Officer Ikeda conduct an outbound inspection of Defendant. Agent Marceleno met later that morning with Customs Inspector Eduardo Meza ("Customs Inspector Meza") and informed him that Defendant was the subject of a Department of Homeland Security Immigration and Customs Enforcement investigation. Agent Marceleno requested that Customs Inspector Meza conduct an outbound inspection of Gowadia in order

to determine whether Defendant had in his possession any documents containing information pertaining to aircraft technology.

The flight was scheduled to depart from gate #31. Customs Inspector Meza had never previously seen Gowadia. In order to identify the Defendant, he asked individuals in the gate #31 holding area to present their passport and airplane ticket. Customs Inspector Meza eventually approached Defendant and asked to see his passport and ticket. The documents confirmed Defendant's identity.

Customs Inspector Meza began the outbound inspection of Defendant at 9:22 a.m. in the gate #31 holding area. (See Exs. 21, 21A, 21B.) Customs Inspector Meza asked Defendant the purpose of his trip. Defendant responded that he was on his way to Singapore to meet with airport personnel in order to introduce his anti-missile commercial aircraft designs. Defendant stated that he was one of the principal developers of the B-2 bomber, and that he had previously worked for Northrop, the U.S. Navy, and the U.S. Air Force. Customs Inspector Meza then asked Defendant what he did for a living. Defendant responded that he was a self-employed consultant in aerospace engineering and ocean ship design. Defendant further responded that he works out of his home on Maui, Hawaii, at 575 N. Holokai Place, Haiku, Maui 96708. Defendant also stated that, from time to time, he worked at

Purdue University and did charitable work for the Ntech
Establishment of Liechtenstein. Customs Inspector Meza then asked
Defendant if he was intending to transport currency in an amount
exceeding $10,000. Defendant replied that he was only carrying
$100 U.S. dollars and $1,000 Singapore dollars. Defendant then
inquired about a container that he had shipped from Singapore,
addressed to his home in Maui. Defendant stated that it contained
antique furniture that he planed to use in his home.

Customs Inspector Meza searched Defendant's hand-
carried luggage (Defendant had no checked baggage) and discovered
a package containing several documents related to anti-missile
aircraft designs. At 9:30 a.m., Customs Supervisory Inspector
Harvey Tse ("Customs Supervisory Inspector Tse") informed Agent
Marceleno that airport customs inspectors had discovered
documents related to aircraft technology in Defendant's hand-
carried luggage. Agent Marceleno reviewed the documents, and
noted that they were similar to the documents found in the search
of Defendant's container on March 29, 2004. There were some
differences. The documents in Defendant's hand-carried luggage
were dated in 2003 and 2004, whereas the documents found in the
container were dated from 1995 to 1999.

Agent Marceleno asked Defendant where he was going and
why he possessed these documents. Defendant stated that he was on
his way to Singapore to work with officials in developing an

8

anti-missile defense for their civilian aircraft. Defendant further stated that he had previously worked on the B-2 bomber for the United States. Agent Marceleno then inquired why Defendant had presentations related to the F-16 fighter. Defendant responded that he had already assisted Singapore in developing their F-16 program, and was now going to work on Singapore's commercial aircraft.

ICE Agent Marceleno had copies of the documents made for further review by experts in order to determine whether the documents contained classified, licensable, or proprietary information. Copies were also made by the CBP and provided to Agent Mohajerin for further review. The original documents were returned to Defendant. The inspection concluded at 9:45 a.m., and Defendant proceeded to board his flight.

On April 22, 2004, Agent Mohajerin informed Agent Marceleno that Lieutenant Colonel William Oetting ("Colonel Oetting") of the U.S. Air Force, Chief of the Special Studies Division, had reviewed the copies and determined that they contained classified information at the SECRET level.

On April 23, 2004, the CBP determined that the copies should be preserved, pursuant to 22 U.S.C. § 401, as evidence of a violation of 18 U.S.C. § 798 ("Disclosure of Classified Information"). The copies were then returned to Agent Marceleno, who sent them to FBI Supervisory Special Agent Pamela McCullough

for storage in a classified evidence vault.


June 7, 2004

On June 7, 2004, Agent Marceleno received information that Defendant was scheduled to depart that morning on China Airlines flight #17 bound for Hong Kong via Tokyo, Japan. Agent Marceleno requested that ICE Special Agent Doug Palmer ("Agent Palmer") proceed to the Honolulu International Airport. Agent Palmer went to the airport and informed CBP officers that ICE and the FBI were conducting a joint investigation of allegations that Gowadia was exporting classified material regarding aircraft technology. Defendant's actions were potentially in violation of various criminal statutes regarding espionage and the export of classified information. Agent Palmer then requested an outbound inspection of Defendant.

The outbound inspection was conducted by Customs Inspector Erickson Padilla ("Customs Inspector Padilla"), who was accompanied by Customs Supervisory Inspector Harvey Tse, Customs Supervisor Inspector Reynolds Higa, and Customs Inspector Song. Agent Palmer was also in the nearby vicinity. Customs Inspector Padilla had never previously seen Gowadia. In order to identify the Defendant, he asked individuals in the gate #31 holding area to present their passport and airplane ticket. Customs Inspector Padilla eventually approached Defendant and asked to see his

10

passport and ticket. The documents confirmed Defendant's identity.

The inspection began at approximately 10:15 a.m. Customs Inspector Padilla escorted Defendant to the side of the gate #31 holding area, away from the other passengers and out of their hearing range, in order to interview him and examine his hand-carried baggage. (See Exs. 21, 21A, 21B.) Customs Inspector Padilla noted that Defendant appeared to be traveling alone. In addition, Customs Inspector Padilla noted that Defendant was initially angered by the outbound inspection, and requested to meet with a CBP supervisor. Inspector Padilla then brought over a Customs Supervisory Inspector in order to speak with Defendant and to "calm him down."

After Defendant appeared to be calm, Customs Inspector Padilla proceeded to examine Defendant's black leather shoulder bag. Customs Inspector Padilla found a set of documents that included graphs and PowerPoint presentations concerning anti-missile C-130 aircraft technology. Customs Inspector Padilla then handed the documents to his supervisor, who in turn handed them to Agent Palmer. Agent Palmer briefly reviewed the documents, and had the CBP makes copies for further review by experts in order to determine whether the documents contained classified, licensable, or proprietary information. The copies were made and retained by the CBP. The original documents were then returned to

Defendant.

Customs Inspector Padilla continued to interview Defendant. In response to one of the questions, Gowadia stated that he had $862 dollars in his possession. He further stated that he earned money through his investments. Customs Inspector Padilla then asked Defendant about his itinerary. Defendant responded that he was traveling on vacation to Australia, Singapore, and Hong Kong, and was returning on June 26, 2004. Defendant's itinerary, however, showed him traveling to Taiwan, Singapore, and Hong Kong. Defendant informed Customs Inspector Padilla that he resides on Maui and is a Chief Designer for NTech Establishment, where he designs ships and aircraft. Defendant also stated that he worked for a children's charity, which raises funds to purchase artificial limbs and provides college tuition for children. In addition, Defendant stated that he had been granted the highest security clearance by the Government. He had previously assisted the "NSA" in capturing fugitive criminals. Defendant also stated that he was a visiting professor of aerodynamic engineering at Purdue University.

Customs Inspector Padilla asked Defendant what he planned to do with the documents that were in his black leather shoulder bag. Defendant responded that they were for a presentation that he would be giving in London on a future trip; the documents were not for his current trip. The inspection

concluded at 10:30 a.m. Defendant then proceeded to the gate to board his flight.

On June 18, 2004, the CBP determined that the copies that were made on June 7, 2004, should be preserved, pursuant to 22 U.S.C. § 401, as evidence of a violation of 18 U.S.C. § 798 ("Disclosure of Classified Information"). The copies were then sent to Agent Marceleno, who, in turn, sent them to Agent Mohajerin for storage in a classified evidence vault.

## ANALYSIS

Defendant Noshir S. Gowadia ("Gowadia" or "Defendant") moves to suppress the following statements and evidence: (1) Defendant's statements to Government agents on August 12, 2003, as Defendant was entering the United States via Honolulu International Airport; (2) the evidence seized by Government agents on March 29, 2004, from a container entering Honolulu, Hawaii; (3) Defendant's statements to Government agents on April 19, 2004, along with all evidence seized, as Defendant was exiting the United States via Honolulu International Airport; and (4) Defendant's statements to Government agents on June 7, 2004, along with all evidence seized, as Defendant was exiting the United States via Honolulu International Airport.

### I.   Border Search

Defendant argues that the seizure of his property by

13

the Government on March 29, April 19, and June 7, 2004, was a violation of his rights under the Fourth Amendment of the United States Constitution.

The Supreme Court has held that searches made at the United States border are reasonable by virtue of the Sovereign Government's right to protect itself by stopping and examining persons and property entering or exiting the country. United States v. Flores-Montano, 541 U.S. 149, 153 (2004); United States v. Ramsey, 431 U.S. 606, 616 (1977), cert. denied, 434 U.S. 1062 (1978); United States v. Abbouchi, 502 F.3d 850, 855 (9th Cir. 2007).

The Supreme Court has stated that border searches are not subject to the warrant provisions of the Fourth Amendment of the United States Constitution, and are inherently "reasonable" within the meaning of that Amendment. Flores-Montano, 541 U.S. at 152-53. For this reason, border searches require neither probable cause nor a warrant. United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985). In accordance with the Supreme Court's reasoning, the Ninth Circuit has held that a border search of the contents of a traveler's luggage, briefcase, purse, wallet, or pockets does not require probable cause. United States v. Tsai, 282 F.3d 690, 696-97 (9th Cir. 2002); United States v. Vance, 62 F.3d 1152, 1156 (9th Cir. 1995); United States v. Grayson, 597 F.2d 1225, 1228-29 (9th Cir. 1979), cert. denied, 444 U.S. 875

14

(1979); <u>Henderson v. United States</u>, 390 F.2d 805, 808 (9th Cir. 1967). The Ninth Circuit has also held that probable cause is not required in the border search of a traveler's laptop computer. <u>United States v. Arnold</u>, 523 F.3d 941, 946 (9th Cir. 2008).

The fact that an individual who is suspected of criminal wrongdoing is specifically targeted for questioning and/or search by law enforcement officers does not affect the legality of the border search. <u>Tsai</u>, 282 F.3d at 695 ("[A]n individual suspected of a crime may be subjected to facially valid, broadly applicable search schemes on the same basis as other individuals" who are searched at the United States border).

While a border search may be initiated in the absence of both a warrant and probable cause, the officer conducting the search must nonetheless proceed in a reasonable manner. <u>United States v. Guadalupe-Garza</u>, 421 F.2d 876, 878 (9th Cir. 1970). The Ninth Circuit has left open the question of "whether, and under what circumstances, a border search might be deemed 'unreasonable' because of the particularly offensive manner in which it is carried out." <u>United States v. Seljan</u>, 547 F.3d 993, 1000 (9th Cir. 2008) (quoting <u>Ramsey</u>, 431 U.S. at 618 n.13). Although the Ninth Circuit has observed that the "reasonableness" of border searches to be "incapable of comprehensive definition or of mechanical application," it has stated "[t]hat the scope of the intrusion, the manner of its conduct, and the justification

for its initiation must all be considered in determining whether a search comports with reasonableness." United States v. Duncan, 693 F.2d 971, 977 (9th Cir. 1982), cert. denied, 461 U.S. 961 (1983).

The facts before the Court do not indicate that there were any "highly intrusive," non-routine border searches in this case. Seljan, 547 F.3d at 1000. Highly intrusive searches, such as strip searches, body cavity searches, and involuntary x-ray searches, "might support a requirement of some level of suspicion" in order to protect the "dignity and privacy interests of the person being searched." Seljan, 547 F.3d at 1000 (quoting Flores-Montano, 541 U.S. at 152); see also Guadalupe-Garza, 421 F.2d at 878; Henderson v. United States, 390 F.2d 805, 808 (9th Cir. 1967). This issue is inapplicable here.

### A. The Container Search on March 29, 2004

In mid to late March 2004, the CBP identified a container of furniture consigned to Defendant that had been shipped from Singapore to Maui, Hawaii. This information was indicated in the container's bill of lading, which had been provided to the CBP by the container's shipping company on March 16, 2004. (Ex. 20A.) Inspector Goldsmith testified that the information contained on the bill of lading was processed through

16

an automatic targeting system, which assigns the container a numerical score. The score indicates to the CBP whether or not the container should be further examined; a high score indicates that a further examination is necessary. Inspector Goldsmith testified that any score above 100 was considered a high score.

The furniture container arrived on April 3, 2004, and was processed through the automatic targeting system. The container received a score of 744. Id. Inspector Goldsmith testified that this was one of the highest scores that he had ever seen. The high numerical score assigned to the container was based upon two principal factors. First, the consignee had never previously shipped anything to the United States that had appeared in the automatic targeting system. In addition, the automatic targeting system did not recognize the "Tomlinson Collection" that appears on the container's bill of lading. (Ex. 20A.)

Due to the high score, the furniture container was set aside for further examination. On April 8, 2004, the CBP performed a "VACIS exam," or Vehicle and Cargo Inspection System, on the container. The VACIS exam allowed the CBP to x-ray the entire container in a few minutes. Upon completion of the VACIS exam, the computer created a printout that the CBP officers could then examine. (Ex. 20.) Inspector Goldsmith testified that upon examination of the printout, an anomaly was identified within the

17

container. The anomaly appeared to be a particularly dense object embedded within the furniture in the container.

The CBP officers opened the container and identified the anomaly. The dense object indicated on the VACIS printout was a box of documents. Inspector Goldsmith further testified that he reviewed the documents, and determined that they contained, among other things, sales contracts and information concerning aircraft infrared suppression technology. He concluded that the documents concerned national security and/or military defense. Inspector Goldsmith immediately contacted Agent Mohajerin and Agent Marceleno. Both agents reviewed the documents, along with FBI Special Agent Charles Beckwith. They determined that the documents merited further review by experts in aircraft technology, and requested that additional copies be made. The CBP provided the additional copies to Agent Marceleno on April 13, 2004. The container was then released for shipment to its final destination.

The border search of a container shipped from abroad and entering the United States is inherently reasonable by virtue of the Government's right to stop and examine property that is entering into the country. Flores-Montano, 541 U.S. at 153; Ramsey, 431 U.S. at 616. The Government did not require probable cause in order to execute the container search, nor did the CBP need to obtain a search warrant pursuant to the Fourth Amendment

18

of the United States Constitution. Flores-Montano, 541 U.S. at 152-53; Montoya de Hernandez, 473 U.S. at 538. During the execution of the container search, none of Defendant's property was damaged, lost, destroyed, or altered in any way. There is absolutely nothing in the record to indicate that the container search was performed in a "particularly offensive manner." United States v. Seljan, 547 F.3d 993, 1000.

For these reasons, the Court holds that the container search by Government agents in late March/early April, 2004, was conducted in a reasonable manner. Seljan, 547 F.3d at 1000; Duncan, 693 F.2d at 977. The search occurred at the United States border as the container was entering the country. The Sovereign Government has the right to protect itself by stopping and examining the container as it passes through the border. Flores-Montano, 541 U.S. at 152-153.

**B.   The Search of Defendant on April 19, 2004, and June 7, 2004, at the Honolulu International Airport**

Gowadia was searched on April 19 and on June 7, 2004, by Government agents as Defendant was exiting the United States via the Honolulu International Airport. The Supreme Court has held that searches of international passengers at American airports are considered border searches because they occur at the

19

"functional equivalent of a border." <u>Almeida-Sanchez v. United States</u>, 413 U.S. 266, 273 (1973); <u>United States v. Duncan</u>, 693 F.2d 971, 977 (9th Cir. 1982), cert. denied, 461 U.S. 961 (1983). In addition, the Ninth Circuit Court of Appeals has stated that the legality of a border search is not affected by whether the search is conducted as the traveler enters or exits the United States. <u>United States v. Abbouchi</u>, 502 F.3d 850, 855 (9th Cir. 2007) ("The border search doctrine applies equally to searches of persons and property exiting the United States as to those entering the country."); <u>United States v. Cardona</u>, 769 F.2d 625, 629 (9th Cir. 1985); <u>United States v. Des Jardins</u>, 747 F.2d 499, 502 (9th Cir. 1984). In order to conduct the two searches on April 19 and June 7, 2004, the Government agents did not require probable cause, nor did they need to obtain a search warrant pursuant to the Fourth Amendment of the United States Constitution. <u>Flores-Montano</u>, 541 U.S. at 152-53; <u>Montoya de Hernandez</u>, 473 U.S. at 538.

Customs Inspector Meza and Agent Marceleno both testified that the search on April 19, 2004, occurred in front of the gate #31 holding area. (<u>See</u> Exs. 21, 21A, 21B.) The search involved examining Defendant's hand-carried luggage. Material of interest that was found in the luggage was temporarily detained by the CBP and copied for further examination. The original material was then returned to Gowadia, prior to Defendant

20

boarding his flight. None of Defendant's personal belonging were altered, damaged, lost, or destroyed by the Government agents. In addition, the search did not involve the use of any particularly intrusive methods by the Government agents (e.g., strip search, body cavity search, involuntary x-ray search). The entire search lasted approximately 25 minutes. After the search was concluded, Defendant proceeded to board his flight. Upon examination of the facts presented by both parties at the hearing and in their briefs, the Court holds that the search on April 19, 2004, was conducted in a reasonable manner. Seljan, 547 F.3d at 1000; Duncan, 693 F.2d at 977.

The search on June 7, 2004, was conducted in a fashion very similar to the prior search. Customs Inspector Padilla and Agent Palmer testified that the search on June 7, 2004, occurred off to the side of the gate #31 holding area. (See Exs. 21, 21A, 21B.) Customs Inspector Padilla testified that Defendant was initially angry about the search, but subsequently "calmed down" after speaking with one of Customs Supervisory Inspectors. Customs Inspector Padilla then proceeded to search Defendant's black leather shoulder bag. Material of interest that was found in the luggage was temporarily seized by the CBP, and copied for further examination. The material was then returned to Gowadia, prior to Defendant boarding his flight. None of Defendant's personal belonging were altered, damaged, lost, or destroyed by

the Government agents. The entire search lasted approximately 15 minutes, and after the search was concluded, Defendant proceeded to board his flight. Upon examination of the facts presented by both parties at the hearing and in their briefs, the Court holds that the search on June 7, 2004, was conducted in a reasonable manner. Seljan, 547 F.3d at 1000; Duncan, 693 F.2d at 977.

Both the April 19 and the June 7, 2004, searches occurred as Defendant was exiting the United States. A Sovereign Government has the right to protect itself by stopping and examining all persons who are exiting the country. Flores-Montano, 541 U.S. at 152-153; Abbouchi, 502 F.3d at 855. For this reason, both searches of Defendant at the Honolulu International Airport were constitutionally valid. Id.

The Court **DENIES** Defendant's Motion to Suppress Evidence Seized as a Result of a Warrantless Search.


### II.  Statements Made During the Border Search

Defendant argues that the three sets of statements that he made to Government agents on August 12, 2003, April 19, 2004, and June 7, 2004, should be suppressed because Defendant was in custody during questioning and he was never read his rights pursuant to Miranda v. Arizona. 384 U.S. 436 (1966).

In Miranda v. Arizona, the Supreme Court held that the

22

police are required to read an individual his rights when he is
"taken into custody or otherwise deprived of his freedom by the
authorities in any significant way and is subjected to
questioning." Id. at 478; Thompson v. Keohane, 516 U.S. 99, 107
(1995). The recitation of an individual's Miranda rights,
however, is not required if the police are questioning an
individual who is free to leave at his will. United States v.
Wauneka, 770 F.2d 1434, 1438 (9th Cir. 1985) ("The procedural
protections afforded by Miranda . . . are triggered only in the
event of a custodial interrogation.")

     The Ninth Circuit Court of Appeals has held that there
are many instances in which a person is detained by law
enforcement officers and is not free to leave, but is not "in
custody" for Miranda purposes. One example is the detention of an
individual by immigration and customs officials at the United
States border. The Ninth Circuit Court of Appeals has held that
this situation is a non-custodial detention, even though the
individual is not free to leave and cannot refuse to be searched.
United States v. Butler, 249 F.3d 1094, 1098 (9th Cir. 2001);
Chavez-Martinez v. United States, 407 F.2d 535, 539 (9th Cir.
1969) cert. denied, 396 U.S. 858 (1969).

     The Ninth Circuit Court of Appeals has also held that,
in the context of border searches, Miranda warnings are not
required "unless and until the questioning agents have probable

cause to believe that the person questioned has committed an offense." United States v. Leasure, 122 F.3d 837, 840 (9th Cir. 1997), cert. denied, 522 U.S. 1065 (1998); United States v. Espericueta-Reyes, 631 F.2d 616, 622 (9th Cir. 1980). The United States Supreme Court, however, has stated that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).

The Ninth Circuit Court of Appeals has stated that the following factors are relevant in determining whether an individual is in custody: (1) the language used to summon the individual; (2) the extent to which defendant was confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. United States v. Kim, 292 F.3d 969, 973-74 (9th Cir. 2002).

Nothing in the record indicates that the brief questioning of Defendant on August 12, 2003, April 19, 2004, and June 7, 2004, at the Honolulu International Airport should be considered a custodial interrogation for purposes of Miranda. Stansbury, 511 U.S. at 323. All five factors outlined by the Ninth Circuit Court of Appeals in Kim indicate that the Government agents were not required to read Defendant his Miranda

24

rights prior to questioning.

First, Defendant was either approached as he was
exiting customs (August 12, 2003) or as he was waiting to board
his flight (April 19, 2004, and June 7, 2004) at the Honolulu
International Airport. There is no evidence that Government
agents used any coercive or threatening language in order to
summon Defendant for questioning. Customs Inspector Padilla did
testify that on June 7, 2004, Defendant was initially angry about
being questioned by Government agents at the Honolulu
International Airport. Defendant subsequently calmed down,
however, after speaking with one of the Customs Supervisory
Inspectors. This incident does not indicate a custodial
interrogation of Defendant.

Second, Defendant was never confronted by Government
agents with any evidence of guilt regarding any crime. On August
12, 2003, Defendant was briefly questioned about the large amount
of currency that he was carrying into the country. Defendant
self-reported that he was carrying $15,000 on a Currency and
Monetary Instruments Reporting Form. No evidence of guilt was
presented by the Government Agents. Customs Inspector Meza and
Agent Marceleno did testify that on April 19, 2004, Defendant was
questioned about the nature and purpose of technical documents
that he was carrying in his luggage. Customs Inspector Padilla
and Agent Palmer also testified that the same thing occurred on

25

June 7, 2004. Questioning Defendant about documents that he was carrying is not synonymous, however, with confronting Defendant with evidence of guilt. Neither the agents nor the customs inspectors could possibly determine, upon a cursory glance, that the highly technical documents that Defendant was carrying were evidence of a crime.

Third, the questioning on all three days occurred within publicly accessible locations of the Honolulu International Airport. (See, e.g., Exs. 21, 21A, 21B.) On August 12, 2003, Defendant was summoned for a secondary customs inspection upon entering the United States. Nothing indicates that the location or manner in which the secondary customs inspection took place was out of the ordinary. On April 19, 2004, Defendant was questioned in the gate #31 holding area, where he was waiting in order to board his flight. On June 7, 2004, Defendant was questioned in a side location adjacent to the gate #31 holding area. Customs Inspector Padilla testified that the side location was chosen in order to be able to converse with Defendant more freely, away from the crowd of passengers that were waiting to board the flight directly in front of the gate. In addition, Customs Inspector Padilla testified that the side location would minimize any embarrassment that Defendant felt about being questioned by Government agents in front of his fellow passengers. The side location was publicly accessible, and

other passengers were in the nearby vicinity. The side location was not intended to create, nor did it create, a hostile or intimidating environment for Defendant.

Fourth, the questioning never lasted longer than 30 minutes. The exact amount of time Defendant was questioned on August 12, 2003, is unclear, but the examination did not last longer than half an hour. Defendant was detained for 25 minutes on April 19, 2004, and 15 minutes on June 7, 2004, as he was exiting the United States. These relatively brief periods of questioning do not indicate a custodial interrogation.

Fifth, there is no evidence in the record that any Government agent ever applied any pressure to detain Gowadia. On August 12, 2003, Defendant was briefly questioned during a secondary customs inspection upon entering the United States. After answering a few questions regarding the large amount of currency he was carrying, Defendant was free to leave. The questioning on April 19 and June 7, 2004, both occurred as Defendant was exiting the United States. The questioning ended well before Defendant's flight was scheduled to depart on both occasions, and Defendant boarded both flights on time.

The facts presented to the Court regarding the questioning of Defendant by Government agents on August 12, 2003, April 19, 2004, and June 7, 2004, indicate that these examinations were not custodial interrogations for purposes of

27

<u>Miranda</u>. <u>See</u> <u>Kim</u>, 292 F.3d at 973-74. In addition, all three examinations occurred as Defendant was either entering or exiting the United States. <u>Miranda</u> warnings were not required during the border examinations unless the questioning agents had "probable cause" to believe that Defendant had committed an offense. <u>Leasure</u>, 122 F.3d at 840. No such probable cause existed during any of the examinations. For these reasons, all three examinations of Defendant at the Honolulu International Airport were constitutionally valid. <u>Id.</u>

The Court **DENIES** Defendant's Motion to Suppress Statements Made at Honolulu International Airport.

//

//

//

//

//

//

//

//

//

//

//

## <u>CONCLUSION</u>

Defendant Noshir S. Gowadia's Motion to Suppress Statements Made at Honolulu Airport (Doc. 214) is **DENIED**.

Defendant Noshir S. Gowadia's Motion to Suppress Evidence Seized as a Result of a Warrantless Search (Doc. 215) is **DENIED**.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 3, 2009



 /s/ Helen Gillmor
Chief United States District Judge

---

<u>UNITED STATES OF AMERICA v. NOSHIR S. GOWADIA</u>; Cr. No. 05-00486 HG-KSC; **ORDER DENYING DEFENDANT NOSHIR S. GOWADIA'S MOTION TO SUPPRESS STATEMENTS MADE AT HONOLULU AIRPORT; ORDER DENYING DEFENDANT NOSHIR S. GOWADIA'S MOTION TO SUPPRESS EVIDENCE SEIZED AS A RESULT OF A WARRENTLESS SEARCH**